WHITE (BOLTON v.). See Case No. 1,616.

## Case No. 17,538.

WHITE v. BROWN.

[1 Wall. Jr. 217.] [1]

Circuit Court, E. D. Pennsylvania. Oct. 23, 1848.

DOMICILE—LOSS BY RESIDENCE ABROAD.

1. Domicil of origin is not lost, for purposes of succession, by very long residence abroad, and mere doubt, even very strong doubt, of a real intention to return.
[Cited in Allen v. Allen, Case No. 211.]
[Cited in brief in Fry's Election Case, 71 Pa. St. 304; Hood's Estate, 21 Pa. St. 111; People v. Cady, 143 N. Y. 102, 37 N. E. 673. Cited in State v. Aldrich, 14 R. I. 173.]

2. The doctrine strongly applied by the verdict of a jury in the case here reported.

This was a feigned issue directed by the court to settle the domicil, at different times,

[1] [Reported by John William Wallace, Esq.]

of Mathias Aspden, an eccentrick, hypochondriack and solitary bachelor, who, born in Philadelphia prior to the American Revolution, died in the city of London, in 1824, leaving a will, executed in Philadelphia in 1791, by which he gave to his "heir at law," a personal estate which, at the time of this issue, amounted to about half a million of dollars. Judge Baldwin sitting in equity in 1833, had inclined to the opinion that Mr. Aspden was domiciled in England: but the matter coming before this court again, it was thought better to direct an issue to be tried at law. The evidence was very voluminous. It consisted of a printed 8vo. volume of nearly one thousand pages small pica; principally composed of letters, memorials, "and accounts of himself," which last Mr. Aspden was in the habit of writing in great numbers. In the course of twenty years since the suit had been originally brought, they had been diligently gathered from every part of the world where this eccentrick gentleman, in the course of half a century, had ever been. Mr. Aspden's history, so far as it bears upon the question of domicil, was essentially as follows:

His father was a native of Lancashire, England, who came to this country in 1718, and established himself in the city of Philadelphia. He left eleven brothers and sisters behind him in Lancashire. He had one daughter before he came, who married here, and whose descendants were numerous. His first wife being dead, he married a widow woman in the state of New Jersey, who had already six children, the descendants of whom were all numerous. Mr. Aspden, the more immediate subject of this report, was the only issue of this second marriage, and was born in 1748, in Philadelphia, in the then British province of North America. In 1760, being about twelve years old, his father went to England for surgical advice, and took his son with him. While there they visited their friends in Lancashire, and the boy was placed for some time at school. How long they remained in England did not appear exactly, but in 1764 Mr. Aspden, the father, made his will at Philadelphia, appointing his son one of his executors, and died there the following year. By this event young Aspden succeeded to an estate which, in the account of those days, was reckoned large; and in the same year we find him established as a housekeeper in his paternal residence at Philadelphia. In 1766 he went again to England, returned to Philadelphia after about a year's absence, and in 1768 or 1769 established himself in trade with one of his half brothers, named James Hartley; a partnership which was attended with very profitable results to both gentlemen, and which continued till the breaking out of the American Revolution, in 1775–6. His political principles, in connexion with this event, were with the British cause. He is spoken of as having been "a friend to his king and country," and was also a constant commercial correspondent of tories. But he never took up

arms against the colonies, and to protect himself from insult mustered with the "insurgents." One of his ships having been arrested in England,—under an order in council, and the English prohibitory act which forfeited all vessels found in American ports after a certain period, if owned in America,—he resolved in 1775 to go to England in one of his own vessels to recover it, but did not go. He sent over, however, all his vessels, and afterwards sold them in England. In March, 1776, being at this time engaged in business yielding him over £2000 sterling a year, he again resolved to sail for England, and having actually sold much of his real estate not immediately in the city, and left a general power of attorney to manage, dispose of and settle all his affairs;—having also made a draft of a will and also a will;—in all three papers describing himself as "of Philadelphia, Merchant"—and in the first as about to "depart the province;" in the second as about to "depart to England;" and in the third as "intending to cross the seas on a voyage to Great Britain"—he went to New York to depart accordingly. He here obtained permission from the British governor to go in an English packet then there, on condition that all his letters and papers should be enclosed to the British secretary of state, Lord George Germaine; a condition to which Aspden assented. Just as he was ready to sail, however, the governor annexed a further condition, st. an oath, that when he got to England, he would give information to the government there of any treasons, rebellions and conspiracies, which he knew of in America. A compliance with this requisition appears to have been repugnant to him; and after every effort to relieve himself from it had proved unavailing, he refused to accede to it, and returned to Philadelphia. Availing himself of a passage by another way, he left Philadelphia about the middle of September—some days before Pennsylvania came into existence as a state, and before it was possible for him to owe to it as a state any allegiance (Respublica v. Chapman, 1 Dall. [1 U. S.] 53), and reached England, through Spain, in December, 1776. In regard to his intention of changing his domicil at this time. Bishop William White, who was connected by marriage with Mr. Aspden, testified as follows: "He was in the habit of familiar intercourse with my family a short time before he went away. I was in habits of free communication with him, and he with me. . . . . He never communicated to me at that time, any intention of changing his domicil, and I do not believe it was his intention to change his domicil at that time. On arriving in England, he proceeded to London, where, according to one of his "memoirs," written probably in 1785, he was almost immediately sent for by Lord Geo. Germaine, with whom he had a conversation of more than two hours, "in the course of which," he tells us that "he answered candidly and without reserve every question that was asked him, and gave Lord George every

information he knew of the state of things in America, as much as if he had been sworn to it a thousand times over." From this time till June, 1785—a term of eight and a half years—he remained in England, with the exception of an excursion of two months to the continent. While there he received from his correspondents in England, their wishes that he may "amuse himself at Spa," "may amuse himself very well in Holland:" And on his return to England from Holland, their congratulations that he had received news of his friends in Philadelphia, where they hope that he "will be so happy as to meet them once again." On one occasion he speaks of himself "as an idle man until he could return to America:" on another, invests £4000 in British funds: on a third, expresses the pleasure it would give him to embrace his relatives in America, but how to dispose of his property in England so as to admit of his return, finds a matter of considerable difficulty: on a fourth, he describes himself "without an object," "awkward, as one may suppose, from the circumstances, and full as much so from not knowing in what place to fix:" on a fifth, will wait for peace, that he may go back again and reside, if possible, in his old habitation: on a sixth, he begs his correspondent to write fully on the subject of return; and adds that "the manner in which he has wasted the prime of his youth in England has been grievous, though not to be helped, as he was circumstanced: Therefore he does not reproach himself, nor does he expect, if he return to America, that he can lead a very pleasant life. "Comfort," he believes, "is not for him in his day."

But up to this date he appears to have been a man of unswerving unity of purpose, compared with himself in all after times. An event took place about this time which, by making it doubtful whether he could make more money by being an Englishman or an American, kept him prolonging and renewing one continuous chain of contradictions with himself and with everybody, which would almost lead us to conclude that the only object of his long life had been to make a "leading case" upon domicil, and to leave his vast estate dependant upon the shape of a puzzle that it should require a quarter of a century to arrange. In 1780 a proclamation was issued against him by the state of Pennsylvania, requiring him to appear by the first of April, 1781, to answer a charge of treason. He did not appear. The time was extended by the state for nine months further; the preamble of the act of extension reciting that it was represented that Mr. Aspden had been called to Europe about his own private affairs, had not received notice of the former act, and would certainly render himself up if indulged with further time. Not appearing at the end of the extension, he was soon after proclaimed a traitor, and all his real estate which he had not sold, confiscated. In consequence of this, he presented, in 1783, a memorial under an

act of parliament to the British government, claiming compensation as a suffering loyalist. In his petition he says of himself: "If he had not been attached to the British government and opposed to the Revolution, it is not reasonable to suppose he would either have left America and all the nearest friends and connexions he had, at the early period he did, or, if this had been his determination, that he would have come to England, when there were other countries to which he might have gone, and been certain of meeting with a friendly disposition both on the part of the people and government, particularly France, where he could have placed any property he might have in Europe or might receive from America, to as much advantage and safety as in England." Speaking of his property he says, that "some was early invested in the funds, and some lay in private hands, at four and five per cent, but the whole became invested in the funds sometime before the peace, a period far from flattering, from a doubt in the minds of many, that a continuance of the war would give them an irrecoverable stroke, and which there is too much reason to suppose would have been the case had it not been for the success of Lord Rodney." But then tells us in reply to a question from the commissioners, whether he intended to return to America, he said, "that he did once, to reside there if he could. That England was a country where he had few friends or near relations, and to give them up as well as his native country was to make a great sacrifice." The commissioners allowed him nothing. He then came, July, 1785, to Pennsylvania, with a view of procuring from the government here a restitution of his property which had been confiscated. Originally an excessively timid man, his mind had by, this time become morbid to a harmless insanity on the subject of his personal safety in America. Although he had every reasonable assurance that he was in no danger whatever, he was so concerned on that matter, that after a stay of but ten days in Philadelphia—consulting most of the time with lawyers about his safety—he went to New York, whence in twenty-three days from the time he had arrived, and without having done any thing at all on the subject about which he came, he set sail forthwith for England, where he soon after arrived. Writing of this journey, he says in one place, "I am just returned from my voyage, an undertaking I was betrayed into by the terms of the treaty;" and in another, "My friends in Philadelphia in their letters to me meant well; but did not enlarge so much as they ought to have done, which led me to consider myself as absolutely protected for a year by the treaty; and under this conviction, I thought it in some degree a duty incumbent on me to go to America, to use my endeavours to get my property restored to me. A few weeks before I sailed I wrote to the commissioners that I was going on this errand, and should take the earliest oppor-

tunity of letting them know the result, which I might have guessed and so been saved this perilous and anxious jaunt. . . Most certainly I found no friends amongst any of them, which could not but heighten the very uncomfortable life I had led in England for seven or eight years. And at last to find myself ensnared to death from being in the face of a publick treaty, was giving the full completion to a man's sufferings. How my lot may be cast now, I know not—or which way I shall turn myself; but happy should I be if I could form some little attachment and home, where I could be a useful member of the community, and at the same time enjoy life with some little degree of satisfaction in the remnant I have left." In another letter of a near date, the same uncertainty appears. Speaking of his fortunate escape from the perils to which he had been exposed at Philadelphia, he says, "Nevertheless I could not help at times casting my eyes back, and feel it a painful circumstance to be thus forced from my native country, friends of my early acquaintance, and a channel of business with which I was well acquainted, and which, if left at liberty to settle in the country, I would soon have got into again, and to as much advantage I believe as ever. To return again, to this country, where I could not help telling the commissioners, in consequence of some questions they asked me, I had few or no friends; a country where the remnant of property I have, will not go much more than half as far, as the same amount would in America; and where I know of no line of business in which I can engage, with either profit to myself or use to the community. Does this accord with the words of the motto, 'Ubi panis, ibi patria?' "

That he was not much more happy after arriving in England, than he was in leaving America, is apparent from a list of grievances which he records in the year 1785, that he had constantly suffered in the British Isles. "My residence," he says, "since my first coming here, (a period of near nine years) except an excursion of six weeks I took one summer to Flanders and Holland, has been constantly in England; where I am sorry to say I have experienced, from first to last, treatment of the most pointed neglect and studied unkindness; and had I been capable of departing from my duty and joining in rebellion, the cause I have had has been great. Invitations have been given to an American lodging in the same house with me, to corporate dinners, and none to me; whom I believe they know to be a man of as fair prospects and as much credit in America as ever was in the city. In London, where I have principally lived—and the greater part regularly for five years at one house in Norfolk street—not a person of my mercantile acquaintance from the city— the only acquaintance I had, or as an American was able to get—ever called upon me to say, are you sick? Are you well? Are you in comfort or affliction? Will you take a

walk this morning in the park; or have you been to a play or any publick place? or will you go? Not a single call in this way from any one, except from one who had reaped considerable profit by me, and a distressed loyalist, now and then for assistance, which was never denied. This situation, joined to my views and prospects in life being cut up, and no likelihood, from the turns things have taken left of returning, (which was my wish and intention) to any good purpose, is more than I can support." But then he finds it impossible to return, being tormented by the recollection that "in America they tell me there is no such person as myself, but that I am dead in law to all intents and purposes." About the same time he writes again: "The insecurity I found myself under in Pennsylvania, led me to make a very short stay there, and to take an opportunity of early returning again to this country, in which I have now been arrived about three weeks; and where I think its probable I shall now remain, as my property in that country it is likely will never be restored. Immediately on his return to England, he presented another petition to the commissioners, but failed to get any thing, because he had not sufficiently made out his loyalty. Previously, in 1786, on the representation of a number of Americans that he had left Pennsylvania before it became a state, and that from the circumstances of his property in England, he could not have left that country during the war without hazarding the loss of his fortune, he had received a pardon of his treason: but his property was not restored to him. He now found himself in the position of a man who had sacrificed a large estate in the cause of revolution, and could get no recompence from either side. His counsel, Mr. Sylvester Douglass, writes to him that the decision of the British commissioners "arose from its appearing to them,—probably by too much candour on your part,—that your property in America might be recovered:" and Mr. Galloway, an able lawyer of Pennsylvania, who had left Philadelphia and joined the British side, writes as follows: "You told them, as you inform me, that you were determined to return to the new states and live there. Now I know the commissioners have carefully made the enquiry whether the claimant intended to desert his allegiance to the British government, and to become a subject of the states. I therefore think, as you have changed your mind and resolved to continue in this country a subject of the crown, you should communicate your resolution to the commissioners, if not already done." In 1787, after these letters of Mr. Douglass and Mr. Galloway, he presented another petition to the commissioners in which he states that in going to America, he had little or no expectation of having his property restored to him, but was willing to make the experiment and take the burden from Great Britain if he could: it not being his intention if he got compensation there, to ask it of England,

and that he had not supposed that in making compensation, parliament intended to restrict persons from going to their former places of residence, as assistance was promised to such as might be able to go back, and there endeavour to recover their rights and properties under the treaty. He concludes by stating that "it is his serious wish and inclination to settle and fix in Great Britain." In 1788, he accordingly received a compensation of what was called the third class; a rate of reward inferior to those loyalists who stayed in America and suffered confiscation, after running every risque there and actively opposing the Revolution. He was extremely indignant at the small allowance thus made him, and in 1789—six years after the peace—presented a fourth petition to the house of commons representing his loyalty, sufferings, long residence in England, investment and centralization of his property there. He took it in person to the house and presented it to the speaker himself: but no notice was given to it.

In March, 1790, he made preparations for going to the United States, and before leaving London, executed a will which he left there and in which he appoints five executors, all Americans, his relatives, and describes himself as formerly of the city of Philadelphia, in the province, now state of Pennsylvania, merchant, now residing in lodgings, No. 10, Great Russell street, London. By this will he left the largest portion of his property to his American relatives, but made also liberal testimonials of his affection for those in England, and added to it the following memorandum: "It is my desire in case I should die in England, that my body be buried at Padiham Church, in Lancashire, and a plain, handsome monument erected to my memory, with a suitable inscription thereon; that being the church where my grandfather and grandmother are buried at, and where all my fathers, brothers and sisters were christened." Before embarking he receives from one of his correspondents, "all good wishes for a fine passage and a happy meeting with his friends in his native land." He reached America September 23d, 1791. What was his precise object in coming here—if it is possible to say of such a man that he had a precise object in any of his actions—did not appear from the evidence. The confiscation of his property and the injustice of the act, early laid hold of his mind; and to his dying hour clung to it with the closest tenacity: occupying it more and more as the possibility of recovering his property here became less and less. He had also left some debts, which as an alien enemy he could not recover, and about the recovery of which it appears that he now occupied himself. Writing now to one of his English relatives, whom he addresses as an acquaintance of his early youth, and one who had always shewn him attention, he says, in speaking of America, "I had the satisfaction to find my relations and friends in general well; the country is in a rising and prosperous way, and Philadelphia

much improved by the addition of many handsome new buildings. Yet I am rather doubtful my return now is too late timed to stay;—from changes and alterations that circumstances make in parties. On looking over the directory, I found I scarce knew above three or four persons in a hundred. In some families I found girls I left in the cradle, grown up and married: Again in others, children I left just breached, and lads from ten to fifteen are grown up and settled;—among the latter some of the most rising merchants. In short, from the Revolution and an absence of fifteen years, my native land appears what I expected, almost an unknown country to me. Being a lodger, and from the upstarts, I feel a sensitive difference between my present and former conditions here." He speaks in another letter of the fact, that his friends in England expected he would return in the December packet, which would have allowed a stay of but three or four months here, and says to his bankers there, that he don't think he will want any more money while he stays, noticing at the same time the fact, that the balance to his credit with them must be about £1200 sterling, which he did intend to invest, but now believes that he shall not. In the same letter he says: "I have lately discovered from an adjudged case (Respublica v. Chapman, 1 Dall. [1 U. S.] 53), in 1781, that I could not lawfully be the object of an attainder, having left America and made my election before the government here was formed: where there was no law, there was no transgression. This had I known ten years ago, would have been of the first importance. From changes and combinations, I am doubtful its now too late." While on this visit, speaking to an American acquaintance of his domicil or citizenship, "he said he was a citizen of Philadelphia, and as long as his father and mother's bones were in the country he should so consider himself; and desired that if he died in England or any part of Europe, he might be brought home and buried where his uncles and aunts were." He lodged during this visit with his half brother, and former partner in trade, Mr. Hartley. Making ready now to return to England, he deposited his Family Bible, in which he made some new entries—plate, about 250 oz. —a trunk of letters of no great value, and some clothes, apparently a court dress, in one of the banks. He then, 9th December, 1791, made another will, by which after a few legacies to his American relatives and none to his English, he gave all his estate to his "heir at law," and appoints three American executors, one of them being the president for the time of the bank where he had made his deposite. This will was executed in the form usual in Pennsylvania, to pass all kinds of estates, but it would have passed nothing in England, but personalty.

Arriving at Falmouth August, 1792, after an absence in America of about ten months, he went into Lancashire, and spent two or three weeks among his relatives in that vicinity. At Preston, he says, I met "with Wilson, who I remember when a little boy there. He is now about 70, and has been some years retired, and lives in the house I used to lodge at, which belonged to his uncle. I told him I had often been sorry my father had not left me there, and put me apprentice to a trade, or some good attorney, or cotton tradesman. It might have saved me many a painful and anxious hour. I also saw there my old master, Shepherd, who is still a very hearty man, of 75 at least, and continues teaching school in the old place he did the 18th January, 1762. All my intimate schoolmates I found dead or dispersed. I saw there our country folks, Mr. and Mrs. Beach, and their pretty daughter—who talk of being in London this winter. From thence I went to Blackbourn, where I met my cousin Mary Aspden, that was now the widow Dyson, and a grandmother, and many other relations who are, most of them, in much improved circumstances and in a prospering way. Mary Dyson's daughter is married to her cousin Mathias. They keep the 'Mathias' in the family; one they tell me in every family." In June, 1793, he proposes to return to Philadelphia, if he can, in August, if not, in the spring; and in the same month directs that the plate, which previous to his leaving Philadelphia he deposited in the bank, should continue there until his further order. In March, 1795, he writes as follows to an American friend: "I flatter myself it will be convenient for me to return to my native land in the course of the summer. Whatever views I might have had ten or twelve years ago, in returning, of reinstating myself again in my former business, no views of that kind will influence me at this time, although very laudable: nor shall I be led by ambition. Offices I shall be glad to see well filled, but never wish to fill one myself, unless the duty comes in turn; I then should be ready to serve from the interest I have in the public welfare. The principal inducement now, is a desire to live again among old friends in my native country, and if not a citizen of the United States to acquire the right of one." In 1796 he writes, "you may expect me, but I cannot tell you when. Circumstanced without rights in England, I can neither well leave it, nor enjoy with satisfaction the property I possess in it." In 1798 he applies to the English secretary of state for a passport, but is told that one "is not necessary for an American to leave this kingdom." Insisting however on having it, he gets one, in which he is described as "native and citizen of America." Giving an "account of himself" in the same year, "supposing he may come under the description of an alien in the alien bill," he says, "when in town, since my last return to England, I have resided in the lodgings I was lately in; considering London as my home, from my property being on loan to government, and from having business on that account there." In the same year he applies for and gets a li-

cense to reside in England, under the "Act respecting aliens resident in England," but at once makes upon it the following endorsement: "An Englishman, born within the now limits of the United States, apprehends that he is improperly called an alien, in this license, and also in a passport to embark for America last July, from his not being a subject of the United States. Otherwise he would have applied to the American minister for a license and passport." In the same year, he sets sail for America, embarking for Charleston, S. C. Finding the ship leaky, and seeing an account in the papers of a likelihood of war between the United States and France, and "being doubtful," as he says, "whether if he should be captured he would be exchanged by either side, from not being a real British subject or real American citizen," he got ashore in Ireland and returned to England; "where, not being at liberty to write to the American minister, from not being an American citizen, (the record in Respublica v. Chapman being against him) he applied to the secretary of state for a license to live in England." In the following year he sends a petition to the lord chancellor about his concerns, and describes himself as "formerly of the city of Philadelphia," merchant; now residing in England, a public creditor of more than twenty years, limited in his residence, under the alien bill, to London, and the neighbourhood thereof; but soon afterwards calls himself "The Right Honorable Mathias Aspden of Philadelphia," a title which he is led to give by way of "explanation," since "he has heretofore been described in the books of the bank as Mathias Aspden, Esq., of different streets, London; and in those of the East India Company, as Mathias Aspden, Esq., of Richmond, Surrey: and now proposes to return again to Philadelphia, his former place of residence, and wishes to show clearly that he is the same person." He resided in London till 1802, occasionally proposing to return to America, but never coming. In July, 1802, during the peace of Amiens, he went to the continent with the intention, as he said, of embarking at some of the ports there, for some part of the United States, but he did not embark. In his passports at Naples and Rome, he is styled "Americano." In February, 1803, he returned to Paris, and thence, in March, to London. In May or June, 1803, he writes that if his health, which is but indifferent, is not worse, he intends to embark for America in the course of a few weeks; but gives certain directions to his correspondents, in case he should not do so; which, it appeared, was finally the case. In February of the next year he still talks of embarking, and assigns as the cause of his delay, "the very extraordinary and hazardous times." In the spring of 1804 he went to Paris: in the summer returned to London, intending, he says, to sail for America, as he now found himself in better health than he had been, and had his affairs arranged. "Could it have been

foreseen," he here adds, "that when I came to England in 1792 I should have remained so long, I should have made a tender of my services to the president in the diplomatick way; flattering myself that I should neither been incompetent to the task, nor unworthy the trust." He did not sail, however, at this time, but, on the contrary, remained in England for eleven years, at which period he set sail, and reached Philadelphia in September, 1815. He had $12,000 on deposit there which had been there since March, 1811, besides a small deposit left in 1791 in another bank. He stayed in that city some weeks, frequently visited the most reputable of his relations; not lodging with them, however; told an old negro servant of one of them that he had been in this country and out of it, that it was the best country he had ever been in, and that he wished to lay his bones here; a wish that he repeated to another witness; presented a petition to the legislature of Pennsylvania, in which he says that the confiscation of his property has caused a loss of £5000 to his heir at law in England; set off for the South, was taken ill, and remained there most of the time that he was in the United States; came again to Philadelphia, took his plate out of the bank, left there, of his large deposit, $361, of his small one $43, and set sail for England, having been twenty-two months, in all, in the United States. In the year after his return to England, he speaks of his having been "abroad in America." In 1806, '9 and '16, he had applied to the British government to be exempted from paying a tax on his dividends there, urging that he was a foreigner, and says in one application that he was "accidentally in England." The commissioners reply that the tax is not deducted in favour of foreigners residing constantly within the British dominions. In 1819 feeling, as he says, uncertain, from the weak state of his health, how soon he could venture on a voyage to America, he determined to visit the baths in the south of France, but it does not appear that he ever did so. In April, 1824, he speaks of his intention to visit America in June of that year. Death, however, put an end to his projects and his history. He died August the 9th, 1824, at lodgings, at London, at the age of 76, and was buried in that city; having made no will since that of 1791, when he left the United States.

His earlier correspondence was principally with his relations in America. After his second voyage to England, in 1792, he became so eccentrick, and troublesome, about his concerns, and finally so hypocondriack and absurd, that most of it seems to have dropped; his correspondents would not reply. And after his visit of 1817 to Philadelphia, he says that he could not find any body there with whom he could safely leave a power of attorney. He had few visitors of any sort in England, and always lived at lodgings while there, as he also did after 1776, when in America. His correspondence was principally with his

bankers, in England and America, through whom he did most of his business. He was constantly investing and re-investing money both in the United States and in England, rarely or never committing any absurdity in that particular. At the time of his death he had in the American funds about $85,000, in the English $200,000, and about $50,000 in those of France. Among the papers found after his death in his trunk, was the usual printed list of the members, issued by the East India Company, with marks designating those persons capable of election to the directorship; a privilege not allowed to American citizens. Mr. Aspden's name was among these.

The issues directed by the court were as follows: (1) Where was the domicil of origin of the testator? (2) Where was his domicil at the time of his making his will, December 6th, 1791? (3) Where was it at the time of his death, August 9th, 1824? (4) Where was it during the intermediate time, st. between December 6th, 1791, and August 9th, 1824?

Mr. Williams, Mr. Randall and Mr. W. B. Reed, in favour of the English domicil.

Mr. Aspden's own declarations on the subject of his domicil are so full of contradictions as to be of inferior weight in determining it. They appear to have been directed, during much of his life, solely by his interests, and to have been made in opposite ways at the same time. Towards the close of his life his mind became so greatly disordered—he was so entirely irresolute—scheming so idly every thing, and never executing any thing—that his declarations of intention, even if sincere, possess but little of the value to which such declarations are usually entitled; a value that is given to them only because they are usually followed by conduct conforming to them. The history of Mr. Aspden's life, his acts and his conduct are of much more importance. He was born a British subject, and he lived for at least 72 years of the 76 of his life, under British allegiance and government. He received much of his early education in England. His father was not one of our early colonists, but came here in mature life, the first and last of his family who ever came at all. The ties of Mr. Aspden were close with England prior to the Revolution. While he still owed allegiance to George III., and before the state of Pennsylvania acquired any right to his allegiance at all, he leaves the state. He sells all his estate here that he can sell, and leaves a power to sell the rest. He transports his property to England, lives there, aids and abets its cause in an open and effective way. He is attainted of treason by this state: he is disgraced by it: all his property is confiscated by it. He is protected, honoured and rewarded by the country in which he lives. With an exception of a visit of three weeks to this country, he now lives for fifteen years in England. During these fifteen years his former country has been changing in every respect. A revolution —the work of seven years—had taken place, to begin with. From a British colony it has become an American sovereignty. From a royal government, it has become a republick. Feeble in every respect when he left it, it is now formidable among nations. Its affairs had been in the hands of his friends: These are banished to England, and the government is usurped by enemies who have attainted his person, and confiscated his estates. His paternal abode is desolated, and has passed to strangers' hands. In looking into the directory, he could not recognize more than four names in any hundred: and his native land appears "almost an unknown country." He goes back to England. Unlike America, it is unchanged in every thing. He visits his relatives with satisfaction. The scenes of his youth greet him with familiar sights: and he "finds his old schoolmaster, Shepherd, still teaching school in the same place he did in 1762;" thirty years before! He lives in England for three and twenty years. At the end of that long time he visits the United States, and asks a restoration of his property, by the confiscation of which his "heir in England had suffered loss." He fails to get it. He goes back to England. There, forever after, he lives. That country is the centre of his affairs. Upon its faith—running into distant years—he places the bulk of all his wealth. There he dies: there he is buried and rests. Who, on such a case, will say that Mathias Aspden wished to die, or did die a citizen of the state of Pennsylvania, domiciled in Philadelphia?

The evidence presents some indicia common to both sides of the question; and some usual ones are wanting to either side. Aspden kept papers and made wills in both countries,—the American will being operative only because it was the latest. He called himself sometimes an Englishman, sometimes an American. He received his education partly here, partly in England. He owned no real estate, and had no mansion-house, nor immediate family.

Let us look then at the remaining indicia: I. Those in favour of the English domicil. II. Those in favour of the American. In support of the former,

1. Length of time: Mr. Aspden passed 28 years of his life, the early part of it chiefly, in America. The residue—48 years—he passed in England. Granting that his original purpose in going there was to save one of his ships, it can't be pretended that this remained his object—his sole object—forever afterwards. The doctrine of special purpose don't apply at all, even if it could apply to a case where two-thirds of a long life were given to following out such an object. A special object which occupies a whole life, becomes a general object. There is nothing like special purpose: that purpose whose type is found in the merchant engaged in a limited and special

venture, the student residing to prosecute studies, the suitor prosecuting a law suit, or the officer acting in a special service. Mr. Aspden was in England, and there was the end of it. He was there, either with an intention of indefinite residence, or he was there without strength of will enough to form any intention. There was nothing to prevent his coming to America at any time. He had no business whatsoever in England, nor ties of any kind which need have kept him there. His money was in the funds: it needed no supervision: it gave no concern. Though fear of punishment—a groundless and absurd fear—prevented his remaining here in 1785, even such fear had vanished in 1791, and is never again mentioned by him. The case then is one of a man who having no special object in staying in a country, stays there notwithstanding; of a man, perhaps, who has no real intentions at all; or—at a large concession—of a man who wishes to keep the domicil doubtful. In such a case, time is an element almost conclusive. Of the effect of it in this connexion, we have an opinion from Lord Stowell, a judge of exquisite conceptions of justice, of learning the most accurate and extensive, and one who had an acquaintance with this class of questions more intimate than any man who ever sat upon the seat of judgment. With other judges, these questions have received occasional consideration. With him they were the study of his whole life, and he was aided in them by the labours of other men who made them the whole study of theirs. He gave utterance to nothing crude, nor to anything not practical. His language is text, his decisions law. "Of the few principles," he says,—The Harmony, 2 C. Rob. Adm. (Am. Ed. 1801) 322,—"that can be laid down generally, I may venture to hold that time is the grand ingredient in constituting domicil. I think that hardly enough is attributed to its effects; in most cases it is unavoidably conclusive: it is not unfrequently said, that if a person comes only for a special purpose, that he shall not fix a domicil. This is not to be taken in an unqualified latitude, and without some respect had to the time which such a purpose may or shall occupy; for if the purpose be of a nature that may, probably, or does actually detain the person for a great length of time, I cannot but think that a general residence might grow on the special purpose. A special purpose may lead a man to a country where it shall detain him the whole of his life. . . . I cannot but think that against such a long residence, the plea of an original special purpose could not be averred: it must be inferred in such a case, that other purposes forced themselves upon him, and mixed themselves into his original design, and impressed upon him the character of the country where he resided. . . . I repeat that time is the great agent in the matter: it is to be taken in a compound ratio of the time and the occupation, with a great preponderance of the article of time: Be the

occupation what it may, it cannot happen, but with few exceptions, that mere length of time shall not constitute a domicil." This doctrine is approved by Mr. Phillimore (On Domicil, 145), and is said by him to be "universally true of all kinds of domicil." The translucent wisdom of Lord Stowell is, on this point, but in harmony with "the majestick sense of Thurlow." "A person's being at a place," said the chancellor, in Bruce v. Bruce, 2 Bos. & P. 229, note, "is prima facie evidence that he is domiciled at that place. A British man settles as a merchant abroad: he enjoys the privileges of the place: he may mean to return when he has made his fortune, but if he dies in the interval, will it be pretended that he had his domicil at home? In this case Major Bruce left Scotland in his early years: he went to India, returned to England and remained there for two years, without so much as visiting Scotland: and then went again to India, and lived there sixteen years and died. He meant to return to his native country, it is said; and let it be granted. He meant then to change his domicil, but died before actually changing it." In Butler v. Hopper [Case No. 2,241], the plaintiff came from South Carolina, where, as well as in Georgia, he had a valuable plantation which he cultivated, and on which he had a furnished house and servants. He visited them every year. From 1794 to 1806, he resided in Philadelphia, with his family and several children, and during the whole time, nearly, was representing South Carolina, either in congress or in the state legislature. Yet on a question of jurisdiction, the court held that his residence in Philadelphia fixed his domicil in that state. In Elbers v. United Ins. Co., 16 Johns. 128, the supreme court of New York say: "The fact of a person residing in a country for a considerable period, leads to the conclusion that he has adopted it as his residence. If the real fact be otherwise, he alone can shew it." "It is not necessary," said Chief Justice Heston of Maine (Greene v. Inhabitants of Windham, 13 Me. 225, 228), in speaking of the requisites to constitute domicil, that a man should go to a place "with a fixed resolution to spend his days there. . . . Men may and do acquire a domicil wherever they establish themselves for the time being, with an intention to remain until inducements may arise to remove." Chief Justice Parker, of Massachusetts, in commenting upon Vatel's definition of domicil, "the habitation fixed in any place with an intention of always staying there," says (Putnam v. Johnson, 10 Mass. 88), that a better definition—one better suited at any rate to the circumstances of this country is, "the habitation in any place without any present intention of removing therefrom."

2. The effect of allegiance: This is an element peculiar to this case. Mr. Aspden, when he left Pennsylvania in September, 1776, was a British subject, and owed allegiance to the king of Great Britain. Before Pennsyl-

vania came into existence as a state at all Mr. Aspden was out of it. He had a right to make his election, and he shewed by his acts that he preferred to follow his original allegiance. In fact the state twice renounced him as a subject, and he twice renounced the state as a sovereign. From the 28th September, 1776, he was an alien enemy. As evidence of intent to assume a British domicil—the ground which we principally assume in adducing it—this is a fact of potential influence. The transition from one domicil to the other, was most easy. There was nothing immissible between the characters of a British colonist and an English subject. There was much that was so between those of a royal colonist and a republican independent. Mr. Aspden then was but following a natural current. Except that he was not upon the same soil, England, after the revolution, was more like his former home than America itself. It therefore bears no resemblance to the case—which will be relied on by the other side of the Marquis de Bonneval—of a Frenchman acquiring a domicil in England, a case—not to speak it profanely—somewhat resembling that which Sir W. Scott thought difficult to presume, of a British Christian acquiring a Mahomedan domicil. But independently of intention, we beg to ask where there is a case of any native born subject leaving a revolting province, whose revolt terminates in independence, and living in the parent country ever afterwards, who has yet been considered as retaining his former domicil? How can a man have a domicil in any country with which he is in active, open, lawful war? He had not a dollar of property in America, nor, if he had not made his election, a single right there, except the right of being hanged or the right of being shot.

3. The centre of Aspden's affairs, the seat of his fortune, was London. His business, so far as he had any business, was investing money. His principal investments were in British funds. He had some in America, as he had some in France; but London was the place where he invested the bulk of his estate; and whence he superintended it all. A portion of his property was in Spanish bonds; a security not known nor marketable on American change.

4. Though he did speak of coming to America, and did come to it on three different occasions, there is nothing, either in his declarations of intentions or in his acts, after his return to England in 1792—certain not after his return there in 1817—to shew that he meant to reside permanently in the United States: After his return to England in 1817, he speaks of his having been "abroad," in America. When he left Philadelphia in 1817, he took away with him the plate—the last remnant of his chattels personal in America—which he had left there for 26 years before; leaving nothing but a will and some old papers of but little value. He left a small deposit in bank, just as he had left a very large one in England, which he now goes back to manage: and he never returns to America again.

5. His political rights, so far as he chose to exercise any, were English: He is enrolled, with his knowledge, it would appear, among the persons capable of being managers of the East India Company, a privilege which is not granted to American citizens.

6. Description in legal documents: In many papers he is described as "formerly of Philadelphia now of London." His being described in passports as an American, is accounted for by the fact that it was on the continent, just after the peace of Amiens, when the title of an American was a guaranty of civility and safety, and that of an Englishman a warrant for detestation, and rudeness. It is of the least possible significance. An Italian consul would call him any thing which he called himself, and was willing to pay for.

7. Place of death: "A man," says a leading case on domicil (Guier v. O'Daniel, 1 Bin. 349, note), "is prima facie domiciled at the place where he is resident at the time of his death: and it is incumbent on those who deny it, to repel the presumption of law." Mr. Aspden died in London, not while passing through there, but after a residence there for 48 years.

II. The only criteria in favour of the English domicil are,

1. The place of birth. We admit that the British province of Pennsylvania was his domicil of origin, but that province no longer existed. Its soil was there, but it was deprived of all that had once made it lovely. Its institutions: its people: its conditions: its prospects were all changed. Mr. Aspden knew nobody here; nobody here knew him: What knowledge had he when he died, of the place of his birth? what of its passing concerns? How often did he ever greet its people here or any where, or walk its streets, or look upon its mansions? With London, its resorts, its ways, its walks, its men and manners, its events of every hour, he was as intimate as any native of London could be whose habits were as sequestered as his own. It was his home unless he was a vagabond. It was his home above all other places, however less it may have been his home, than it might have been, or than it necessarily is to most of its inhabitants. The place of birth is powerful, but it is not omnipotent. It can't control time, allegiance, property and a long, consistent course of action. That would put an end to all questions of domicil by resolving them all into questions of birth. "A person's origin," said Lord Thurlow (Bruce v. Bruce, 2 Bos. & P. 231, note), "is to be reckoned as but as one circumstance in evidence which may add to other circumstances, but it is an enormous proposition that a person is to be held domiciled where he drew

his first breath, without adding something more unequivocal." Lord Loughborough (Bempde v. Johnston, 3 Ves. 202), laid "the least stress" upon the place of birth taken alone, though in conjunction with the place of education and connection, it had great weight.

2. His expressions of intention to return to America: Mr. Aspden's declarations of intention—to say nothing of the fact that there are about as many one way as the other, and that they were dependent upon contingencies, (as of health) which never occurred—are shewn by his history through a long series of years, to have had scarcely any connexion or correspondence with his conduct. If they existed at all, they were without the evidence of any overt act: they were residing secretly and undistinguishably in the breast of the party, and liable to be revoked every hour. Lapse of time, country of allegiance, place of residence, seat of fortune, place of death and burial, therefore, all act with their natural and uncircumscribed force. In Stanley v. Bernes, 3 Hagg. Ecc. 372, it was proved that Mr. Stanley, who resided for a long time in the Portuguese dominions, frequently described himself as a British subject, and often expressed it as his most ardent wish to lay his bones in his native soil: speaking with abhorrence of being buried where he then was. He often spoke also with affection of the English religion, and with disgust of the Roman Catholick: and it was proved that in expectation of an invasion by the French, he had transferred his property, by way of safety, from his own name to his son's, who was born in Portugal. On his death, moreover, he was buried in the English burying ground, and his will was taken possession of by the British consul in the way usual with the wills of English subjects alone. But the high court of delegates considered that all his declarations of intentions were outweighed by his residence of fifty years in Portugal. This was a case of succession.

It was part of the case of Bruce v. Bruce [supra], that in many letters Major Bruce "had expressed an anxious desire to return and spend the remainder of his life in his native country; particularly he wrote to that purpose a few months before his death, and he was in the course of remitting home his money when he died." But the house of lords held, that as he had been domiciled in India, and as he was not actually on his way to Scotland, and had not any fixed and settled intention to return there at any particular time, India must be considered as the place of his domicil. In the Case of De Bonneval, 1 Curt. Ecc. 868, the marquis had spoken of England as his home, and frequently expressed his preference for a residence there. "I do not, however, consider" said Sir Herbert Jenner, in giving his opinion on the case, "that the declaration made by the deceased at different times, that he

preferred a residence in this country, can be a ground upon which the court is to rest its judgment: the domicil cannot depend upon loose declarations of this sort, where there are documents which shew that the party looked to France as his home." If documents, as Sir Herbert Jenner says, be stronger than declarations, certainly facts (which we have in this case instead of documents), are stronger than either. In the case of The Venus, 8 Cranch [12 U. S.] 281 (where a citizen of the United States established his residence in England, between which and the United States war suddenly broke out, and his property was captured by an American ship, before he could have acquired any knowledge of the war), the majority of the supreme court refused to hear evidence at all, of the party's mere declarations of intentions to return. "Mere declarations of such an intention," said Judge Washington (8 Cranch [12 U. S.] 281), in delivering the opinion, "ought never to be relied upon when contradicted, or at least rendered doubtful by a continuance of that residence which impressed the character. They may have been made to deceive, or, if sincerely made, they may never be executed. . . . But when he accompanies those declarations by acts, &c." This, it may be admitted, was a rule of policy, but it was a rule of policy founded upon the fact that intention is a thing easy to be counterfeited; easy to be assumed whether it exist or no; and that in doubtful cases it must be proved by acts and not by declarations.

Mr. Tilghman, Mr. J. M. Read, and Mr. H. D. Gilpin on the other side:

The most important question here is, "What is the legal meaning of domicil?" Among French jurists Vatel defines it (Droit des Gens, l. 1, c. 19, § 218), "a fixed residence in a place, with an intention of always staying there, made known by a declaration, express or tacit." "He who stops," he adds, "even for a long time in a place for the management of his affairs, has only a simple habitation there, but has no domicil." Dargentré, "a civilian of high authority," defines it (quoted in Phillim. Dom. 11) negatively in saying, that "they who have no intention of fixing their abode in a place, but are absent somewhere for convenience, necessity or business, cannot, by any lapse of time, create a domicil, cum neque animus sine facto, neque factum sine animo ad id sufficiat." Boullenois says (Id. 13): "A man cannot be said to belong to a place unless he be then in the spirit and meaning of abiding there." Among German jurists, Wolff calls it (Jus Gentium, c. 1, § 137) a fixed habitation in a certain place with the intention of remaining there. Forcellini (quoted in Phillim. Dom. 14, note), among the Italians, says: "Domicil is the home, the seat of domestick life, the residence

which is certain and permanent." "A domicil then," says C. J. Marshall (dissenting opinion in The Venus, 8 Cranch [12 U. S.] 290), "in the sense in which this term is used by Vatel (and the same remarks applicable to the definitions of other jurists), requires not only actual residence in a foreign country, but an intention of always staying there. Actual residence without this intention amounts to no more than simple habitation. . . . The intention which gives domicil is an unconditional intention to stay always." Domicil means then, we say, a man's permanent residence known to be such by his declarations and acts, which he has no intention of leaving, and which he regards as his established home.

The definition of domicil generally being settled, we say that domicil of origin—by which is meant the place of birth and immediate connexions, the place in which, according to the Roman law, a man is born or ought to be born—that this domicil subsists during minority and until the person has legally the will to change it by arriving of age. It is a domicil fixed by law, what the law calls a necessary domicil, and, quite independently of the parties' will, attends him through his minority. The supreme court of Pennsylvania (School Directors v. James, 2 Watts & S. 571) states this matter with legal precision, as well as with force and beauty of sentiment: "No infant who has a parent, sui juris, can in the nature of things have a separate domicil. This springs from the status of marriage which gives rise to the institution of families; the foundation of all domestick happiness and virtue which is to be found in the world. The nurture and education of the offspring make it indispensable that they be brought up in the bosom and as a part of their parents' family, without which the father could not perform the duties he owes them, or receive from them the service that belongs to him. In every community therefore they are an integrant part of the domestick economy, and the family continues for a time to have a local habitation, and a name after its surviving parents' death. The parents' domicil therefore is consequently and unavoidably the domicil of the child."

This domicil of origin remains through life unless a new one is acquired by the positive act of the party, in abandoning it, and taking, animo et facto, another as his domicil. A leading case on this subject is a recent one, that of De Bonneval v. De Bonneval, 1 Curt. Ecc. 856. The Marquis De Bonneval was born in France in 1765, of French parents, lived there till the revolution in 1792, came to England, stayed there till 1814 or 1815, received an allowance as a French emigrant, returned to France with the Bourbons in 1814, returned to England on Napoleon's return in 1815, but after his defeat went immediately back. After that time until his death, in 1836, he was occasionally living in one country and the other: he had a house in England on a lease of 44 years, bought in 1820: he died there, having made a will in each country, the last one being in France. He was held to be domiciled in France. The court said: "Having first ascertained the domicil of origin, that domicil prevails till the party shall have acquired another with the intention of abandoning the original domicil. The acquisition of a domicil does not simply depend on the residence of a party; the fact of residence must be accompanied by an intention of permanently residing in the new domicil and of abandoning the former; in other words, the change of domicil must be manifested, animo et facto, by the fact of residence and intention to abandon. Again, the presumption of law being that the domicil of origin subsists until a change of domicil is proved, the onus of proving the change is on the party alleging it, and this onus is not discharged by merely proving residence in another place, which is not inconsistent with an intention to return to the original domicil; for the change must be demonstrated by fact and intention. "I do not consider," said Sir Herbert Jenner, "that the declarations made by the deceased at different times, that he preferred a residence in this country (England) can be a ground upon which the court is to rest its judgment; the domicil cannot depend upon loose declarations of this sort, where there are documents which shew that the party looked to France as his home. Unless the evidence was nicely balanced, the court would pay no regard to such declarations, shewing a preference for a residence in this country; and not a decided intention to abandon his native land and take up his sole residence here." Sir Herbert, in delivering the opinion of the court, alluded too to the circumstances that this residence in England, in the first instance, was because the marquis was compelled to leave France by the revolution: he did not come with the intention of taking up his permanent abode in England and abandoning his domicil of origin, that is, to disunite himself from his native country. A continued residence in England was not sufficient to produce a change of domicil of origin. In the Case of Sautereau (quoted in Phillim. Dom. 58), he had his domicil of origin in Burgundy, he left there in his minority, never returned, but died in another province of France. Yet his domicil at the time of his death was held by the French lawyers to be Burgundy, because he was first sent from there in the capacity of a steward or servant, and under one person and another, continued to act in the same capacity till his death. As there was no intention of permanent change, his domicil of origin remained. In the case of Craigie v. Lewin, 3 Curt. Ecc. 435, the court said that "where the question of domicil at the time of

his death, was in equilibrio, the place of birth and origin might have turned the scale." In Somerville v. Somerville, 5 Ves. 750, the master of the rolls said: "The original domicil, or, as it is called, the forum originis or the domicil of origin, is to prevail until the party has not only acquired another, but has manifested and carried into execution an intention of abandoning his former domicil, and taking another as his sole domicil."

What then constitutes such a change? Nothing but the absolute abandonment of the former domicil, and the taking of a new one animo et facto. Thus, where one whose domicil of origin was Hanover, went to Hamburg and lived there ten years, carrying on mercantile transactions, and then went to Paris where he died a bachelor, leaving his property at Hamburg; Hanover was held by Grotius and other Dutch lawyers (quoted in Phillim. Dom. 103) to be his domicil at the time of his death, because he made no declaration of intending to change his domicil of origin. In Munro v. Munro, 7 Clark & F. 842, Sir Hugh Munro was born in Scotland, and resided there till he came of age in 1784: for the next four or five years he visited France but always returned to Scotland, though not to his family mansion. In 1794 he went to London, took a house there, formed an illicit connexion with a woman whom he afterwards married. A daughter was born, while they were thus living in London, but before the marriage. In 1802 they returned to Scotland. The question was as to his domicil at the time of his child's birth. Had he changed his domicil of origin, which was Scotland, so as to establish a new domicil in England while he lived there? Seven out of thirteen of the Scottish judges thought he had: and that England was his domicil. But the English house of lords reversed the decision on the express ground that to constitute a change of his domicil of origin, he must not only have acquired another residence, but coupled it with the intention of making it his sole residence, and abandoning his domicil of origin.

Nor does the circumstance of a person's death at a place different from his domicil of origin, of itself, afford more than a slight presumption, and one to be explained, that it had become his place of residence. In the case of Johnstone v. Beattie, 10 Clark & F. 138, though the party (a Scotch lady,) went to England on account of her health, stated she expected to die there, and gave directions that her body should be buried there, still as it did not appear that she had abandoned her residence in Scotland, this fact was not held to establish a new domicil in England. In our own case of Guier v. O'Daniel, 1 Bin. 349, note, Guier, who was a seafaring man, died abroad, but his domicil was held to be at Wilmington, which was his domicil of origin, and which it was held that he had never relinquished.

It is true that in questions of commercial domicil, time is not only an important element, but generally a conclusive one. Intention is often of no moment at all: the party's acts settle every thing. That at least is the English law. The case of The Harmony, from which Sir W. Scott's opinion is quoted on the other side, was a case of commercial domicil, not of domicil for succession. And even in cases of commercial domicil, the English courts have gone further than the continental jurists, and further, it is probable than we have. Chief Justice Marshall, in speaking of the decisions of Sir William Scott says, (dissenting opinion in The Venus, 8 Cranch [12 U. S.] 299): "It is impossible to consider them attentively, without perceiving that his mind leans strongly in favour of captors. . . . In a great maritime country, depending on its navy for its glory and its safety, the national bias is perhaps so entirely in this direction, that the judge, without being conscious of the fact, must feel its influence. However this may be, it is a fact of which I am fully convinced: and on this account it appears to me to be the more proper to investigate rigidly the principles on which his decisions have been made." Mascardus ("himself no mean authority," says Mr. Phillimore,) tells us (quoted in Phillim. Dom. 148) that he was taught by the chief of all interpreters of the law, by Bartolus, that where a person retained the intention of returning to his former domicil, a thousand years would not suffice to establish a new one. Locré speaks (Id. 148) of a case decided by the parliament of Paris, where a person who had been absent for fourteen years, retained his domicil by a correspondence, intimating his intention to do so. According to the Sardinian Code (Id. 160), it appears that "no domicil in a foreign country, however long and permanently established, will, of itself avail to prove that the person establishing it had abandoned the intention of returning to his native country, and so incurred the forfeiture of his civil rights." In short, the true doctrine of change of domicil for purposes of succession, is laid down by the judge of the prerogative court in a recent case (Collier v. Rivaz, 2 Curt. Ecc. 855): "Length of time will not, alone, do it: intention alone will not do it; but the two taken together, do constitute a change of domicil."

In a country so greatly and extensively commercial as the United States, the courts which administer the law of nations, will be careful not to establish principles in conflict with the national policy. Chief Justice Marshall, who looked at these matters with the comprehensive eye of statesmanship, not less than with the close observation of the logician, says (dissenting opinion in The Venus, 8 Cranch [12 U. S.] 293): "Nothing can be more obvious than that the affairs of a commercial company will be transacted to most advantage by being conducted as it respects both purchase and sale, under the eye of a person, interested in the result. The nation who

takes an interest in the prosperity of its commerce, can feel no inclination to restrain its citizens from residence abroad for the purposes of commerce, nor will it hastily construe such residence into a change of national character to the injury of the individual. It is not the policy of such a nation, nor can it be its wish, to restrain its citizens from pursuing abroad a business which tends to enrich itself." A maxim of the law is, that native domicil easily reverts. The foreign domicil being adventitious, de facto, and somewhat unnatural, prevails only while it is actual and complete. 1 Am. Lead. Cas. 561.

To apply these principles to the case of Mr. Aspden: Mr. Aspden's domicil of origin was Philadelphia. His father was a settled inhabitant there and died there. Aspden was born there, and lived there—a housekeeper and house owner—until the Revolution. There is no evidence that when he left Philadelphia in 1776, he designed to abandon his American domicil and to acquire a new one in England. If he did not leave Philadelphia on a special purpose, he left it at least as a person who was unsafe in it during a civil war. At the worst, he was in a condition similar to that of the "exile" or "prisoner," who, says Denisart (quoted in Phillim. Dom. 88, note), "are never presumed to have lost their design of returning, no matter how long a time may have passed since they were originally placed under the restraint." He came back again in 1785, the earliest date possible after the peace, and did not stay, only because he was in bodily terrour, not because he wished to abandon the country. Other persons thought that his fears were chimerical: whether they were so or not it is difficult now to decide; he himself thought them well grounded, and there is no doubt that they were real. His absence till 1791, was therefore in a measure a constrained or enforced absence. There is no case that decides if a man through terrour—even though a vain terrour—leaves his country, that he also loses his domicil for purposes of succession. Mr. Aspden was not absent six years after his second departure in 1785, before he returned again: and made in 1791 a will, executed, not according to English forms, but according to the forms of Pennsylvania. He appoints three executors, all of them American; and makes such a provision as to one of them, that the will could never be without an American executor, nor his estate ever require any sort of administration. He thus guards effectually against any Englishman's taking possession of his effects, in case of his death in England. He leaves that will here: lived with it as his last will, and died with it as his last will. He is not abroad in England two years, before he expresses his intention to return again to America, and directs his plate not to be removed from the place where he left it; and in six years afterwards, 1798,—having constantly made mention of his intention to come here—he does actually set sail for America, and would have arrived. had not the ship proved dangerous to such an extent, that he deemed it necessary for his life to get ashore in Ireland. He remains in England only four years more, before he leaves it, in 1802, for the continent. He declares that his purpose in going to the continent was to set sail for the United States. Whatever his purpose really was, it is certain that the continuity of his English residence was destroyed; and he styles himself and is styled in Italy, "an American." He stays nearly a year on the continent. In 1804 he goes to Paris; again breaking the thread which the other side treats as continuous and unbroken from its origin. A few years after this, in 1808, the relations between the United States and England became unsettled and uncomfortable: War is actually declared in 1812, and lasts till 1815, during all this time he is much safer in England than in crossing the ocean; being, as he says, in danger if he came here, of being captured both by French and American cruisers. Peace is made, February, 1815, and in September of that same year, almost as soon as it was possible for him to cross the ocean safely, he is again in Philadelphia. He remains in the United States two whole years: and when he leaves the country he still leaves his will behind him here. Soon after returning to England, he expresses his design of coming back to the United States, and no doubt would have come a sixth time had not his death intervened.

Now is there any thing in all this to control that rooted principle of law, that domicil of origin remains until the party has actually abandoned it? abandoned it, animo et facto and acquired a new one. Mr. Aspden did not remain continuously in England. He was roving about—a wanderer free—in various countries—in different hemispheres. and upon the ocean that divides them. Even had he, by lapse of time. lost his original domicil in 1815, the only time at which it can be really supposed that he lost it, that domicil was resumed by his residence of two years in America in 1815–16–17. It is unimportant that he did not reside continuously at Philadelphia during these two years. He resided no where continuously. He was a bachelor, with no liens. no affections and with neither capacity or disposition. it is probable, to fix himself anywhere. Had he died in America on this visit, would any question of domicil ever have arisen? Mr. Aspden was an irresolute and most procrastinating man: his intentions of coming to America were perfectly real. but he wanted energy to execute them promptly. In each one of his last four departures from England, he had been declaring for years his intention of coming. before he actually came: he delayed the execution of his intentions. but he executed them in the end. So for some time before his death he was getting ready to return. He was irresolute—not about the fact of his return. but about the exact time. He delayed, deferred and procrastinated, just as he had done in the four cases before. But

no question, had he lived, he would ultimately have arrived a fourth time—just as he had done three times before.

GRIER, Circuit Justice. Domicil is a word which we have adopted from the Roman or civil law, but which it has been considered so difficult to define with precision and accuracy, that an eminent writer (Bynkershoek) on the subject was unwilling to hazard a definition, and therein has been commended by a learned English judge (Lord Alvanley, 5 Ves. 750) for his wisdom.

The Roman codes described domicil as follows: "In whatever place an individual has set up his household gods and made the chief seat of his affairs and interest; from which, without some special avocation he has no intention of departing; from which when he has departed he is considered to be from home; and to which, when he has returned, he is considered to have returned home. In this place there is no doubt whatever he has his domicil." Quoted in Phillim. Dom. 11.

It would tend rather to confuse than to elucidate the subject, to notice the many other attempts at definition of this word, and to attempt to point out their several merits or defects. It may be correctly said, however, that no one word is more nearly synonymous with the word "domicil," than our word "home." The definition given by the late Judge Rush of this city (Guier v. O'Daniel, 1 Bin. 349, note), which has received the approbation of an English writer (Phillimore) on this subject, combines, it is probable, accuracy with brevity beyond any other. He defines it "a residence at a particular place, accompanied with positive or presumptive proof of an intention to remain for an unlimited time."

Two things, says Judge Story (Confl. Laws, § 44), must concur to constitute domicil. First: Residence. Secondly: The intention of making it the home of the party. There must be the fact and the intent, and in many cases actual residence is not indispensable to retain a domicil after it is acquired, but it is retained animo solo, by the mere intention not to change it, or adopt another. If therefore a person leave his home for temporary purposes, but with an intention to return to it, this change of place is not, in law, a change of domicil.

There are few subjects presented to courts for their decision which are surrounded with so many practical difficulties as questions of domicil. The residence is often of an equivocal nature; the intention extremely obscure, and has to be gathered from acts and declarations oftentimes conflicting and contradictory. It is probable, however, that there is not a case to be found in all the books which presents more difficulties arising from this cause than the one before us. The testimony fills an 8vo. volume of nearly 900 pages. You have the whole history of the life of Mathias Aspden, all that he did, much that he said, and much more that he has written. Indeed it would seem, that being a man of much leisure he had spent a great part of his life in writing documents which bear—some indirectly, and many directly—upon the very question which you are called on to decide. And with an obliquity of genius rarely exceeded, he has enveloped it in so much contradiction and confusion and obscurity that it will require your utmost attention and the vigorous exercise of all your powers to solve the question.

On the first point submitted to you there is no doubt. The domicil of origin of Mr. Aspden was Philadelphia, in the then British province of North America.

The next question will be: Did the testator ever change this domicil, and acquire another; —a domicil of choice as distinguished from his domicil of origin? And this is the great question in the case.

In the consideration of it the following rules must be observed:

1. That although a man may have two domicils for some purposes, he can have one only for the purpose of succession.

2. That the original domicil, or forum originis, as it is called, is to prevail until the party has not only acquired another, but has manifested and carried into execution an intention of abandoning his former domicil, and taking another as his sole domicil. A man cannot be considered as a vagabond, or a person without any domicil; for the domicil of origin is not abandoned until a new one has been intentionally and actually acquired.

3. That in order to acquire a domicil of choice, the fact of residence must be coupled with the intention to abide an indefinite time, or make the place his home. But the shortest residence with such an intention is sufficient. A residence in one place for a great number of years is a violent and continuing proof of the animus manendi; yet if it clearly otherwise appear that such residence was without such intention, it would be of itself insufficient to constitute such domicil.[2]

4. That the burden of proof lies on him who asserts a change of domicil.

5. That the domicil of origin easily reverts, and that it requires fewer circumstances to constitute domicil in a native subject or citizen than to impress the national character on one who is originally of another character. The acquired domicil, however, must be finally abandoned before the domicil of origin can revert.

6. A fugitive from his country on account of civil war still retains his domicil, unless he shows an intention of a total abandonment of his country by the acquisition of a new domicil of choice. Nor will the confiscation

[2] This remark, the court observed, might not be correct to this extent, in cases of commercial domicil in time of war, or of matrimonial, forensick or political domicil in time of peace; but was to be received as correct in its application to cases of testamentary domicil.

of his property by the new government, in the case of a revolution effected after civil conflict—nor the attainder of his person—of themselves, put an end to his domicil of origin. If he elect to adhere to the old sovereign or government, looking forward with hopes of its re-establishment, his domicil of origin is not necessarily abandoned by such election. Allegiance to the existing government, or the exercise of political rights, constitute no part of the definition of domicil. These facts may nevertheless be of great importance in judging of the intention. Consequently, adherence to the king of Great Britain in our Revolutionary War, although it might have caused the forfeiture of the life or property of an American citizen, was not, of itself, an abandonment of his domicil. The estates of those persons who fled from England with the Stuarts and died in France, were administered by the French courts according to the law of England as their domicil.

Keeping in view these principles, you will inquire whether Mr. Aspden ever acquired a new domicil of choice. It is admitted that he left Philadelphia, his domicil of origin, in 1776 and went to England, where—with the exception of two or three years spent in the United States and in journeys on the continent of Europe for health or amusement—he lived until his death in 1824. The actual habitancy being thus clear, the question then depends on intention. Did he go to England with the intention of making it his home? If not, did he at any time while there, change his intention so that the animus manendi concurred with the act of habitancy, so as to constitute a change of domicil? The leading fact that he spent the greater part of his life in England and died there, raises a violent presumption that his intention corresponded with his acts. But as I have before said, in questions of succession even forty-eight years spent in a foreign country may possibly be accounted for, and the inference drawn from length of time rebutted.

(THE COURT then gave a detailed history of the evidence, essentially as the reporter has presented it in his statement of the case.)

Without expressing any opinion on Mr. Aspden's intention, I may say that the testimony is full of contradictions: and would afford clear ground for a verdict either way, if the testimony on the opposite side be left out of view. As it is, the question is susceptible of much doubt.

Previous to the testator's return to England in 1785, there is no sufficient evidence, I think, of an intention to make England his home. Between 1785 and 1791, when he returned a second time to Philadelphia, there are declarations both ways. How far, on the one side, they may be accounted for as made by the suggestion of Mr. Douglass and Mr. Galloway, his counsel in England, to gain a certain end there; or how far, on the other, they may have been prompted by a hope of obtaining a return of his property here, you will judge

for yourselves. After he obtained his pardon here and compensation in England, his heart appears to have been set on getting his attainder reversed and his property here restored; and the hope, it appears, never forsook him. Did it tend to keep the animus revertendi always alike in his breast? Does his reporting himself as an "alien" in England, and his styling himself "The Right Honorable Mathias Aspden of Philadelphia," shew that he considered himself an American? Or were such designations resorted to, only for the purpose of evading a tax on his dividends in England?

In fine, without wishing to express any opinion on the merits of the question, I may remark, that the biography of the testator, exhibits him as a man who led an unhappy and discontented life. Love of money his ruling passion, without ties of family or friendship, he fled to England to save his personal property from confiscation, and thereby lost his real property here. Notwithstanding his political principles made him prefer his English allegiance in the War of the Revolution, and though he was extremely vexed by the treatment which he had received from our legislature, he still retained a strong attachment for his native land. When in England he was absent from the associations and companions of his youth, and ever planning his return. When he returns he finds every thing changed. The friends of his youth have been removed by death: New men have grown up and are at the head of affairs. Every thing has been moving forward, while he alone has stood still. He fails to meet the respect and attention to which he fancies that his wealth entitles him. He becomes sour and discontented, and returns to England to inflict on chancellors and parliaments the endless memorials which he had lately found ineffectual on legislatures and congresses. Time, instead of assuaging the sense of his grievances, seems only to add to their weight and number: his hopes of remuneration from republican honour or royal generosity, become at last a monomania: he spends his time in writing memoirs and memorials contradictory and unintelligible, to annoy his contemporaries and puzzle posterity, and indites a will in a few lines, whose meaning, after twenty years of litigation yet remains to be settled. A wandering hypochondriack in search of health, he spends his time in vibrating between two continents, is occupied throughout his life in accumulating wealth for unknown heirs, and finally dies without a friend to soothe his pillow or follow him to the grave! Whether he died an Englishman or an American, it is for you, gentlemen, to decide.

The jury having been out for twenty-four hours, found a verdict in favour of the American domicil at each of the dates mentioned in the issues.

A few days afterwards a motion was made by the plaintiff for a new trial, which was refused by the court, who expressed their satisfaction with the finding of the jury.