Fayette *v.* Livermore.

INHABITANTS OF FAYETTE *vs.* INHABITANTS OF LIVERMORE.

*Pauper. R. S., c. 24, § 1. Settlement.*

Bodily presence must concur with intention to enable a single woman to establish a home, the continuance of which for five years will give her a settlement under the sixth mode prescribed in R. S., c. 24, § 1.

Even when she has long been a member of the family of a brother who has supported her, and designs with his knowledge and consent to remove with him to another town, but is delayed upon the road by bodily ailments, and he with his family arrives at such town some weeks before she does, she cannot be said to have her home in such town, within the meaning of the pauper law, until she actually comes there.

If the brother, being under no legal obligation, by contract or otherwise, to support her, before the lapse of five years calls upon one of the overseers of the poor of such town and informs him when the five years will expire, and refuses to support her any longer without compensation from the town, and her pecuniary circumstances and bodily condition are such as to make her stand in need of immediate relief when such support is withdrawn, and thereupon the overseer directs the brother to supply her and he will see to it, and upon the same day communicates these facts to another overseer who assents thereto, and they forthwith make a notice to the town where she has her settlement in the ordinary form that she has become chargeable, &c., such notice is not invalid as being premature, although no bargain is made with the brother as to the price of her board per week, until some days later, and it does not appear at the time of making the notice that the pauper has consumed or received any supplies under the order thus given.

The fact that these things were done but a few days before the completion of five years from the time the pauper came to the plaintiff town, and proof that the brother declared to the overseers of both towns his intention to cast her support upon the town from which they removed, and carried the notice from the overseers of the plaintiff town to those of the defendants, in pursuance of an arrangement made when he first called upon the overseers of the plaintiffs, are not such conclusive evidence of bad faith on the part of the overseers of the plaintiffs as to justify setting aside a verdict in their favor.

It is not necessary that a majority of the overseers should make a personal examination as to the necessity for supplies. One may act upon information derived from one of his fellows, and if he ratify an order previously given for supplies by his associate, it is sufficient to constitute a furnishing by the town.

ON EXCEPTIONS AND MOTION FOR A NEW TRIAL by the defendants to set aside a verdict rendered in favor of the plaintiffs for $120.17 for supplies furnished by contract to a pauper with whose support the defendants were chargeable. The facts and the law as stated at the trial sufficiently appear in the opinion.

*Baker & Baker* and *R. Washburn,* for the defendants.

*A. Libbey,* for the plaintiffs.

BARROWS, J. The alleged pauper, Julia A. White, is a woman sixty-two years old, an invalid since she was fifteen, usually confined. to a dark room on account of an affection of the eyes, mostly dependent upon her father (with whom she lived in Livermore, for sixteen or seventeen years prior to 1843,) until his death in 1846, since which she has lived with her brother, George W. White, and been supported by him up to December, 1870, as one of his family. The family removed from Livermore to Dead River Plantation in 1843, prior to which time her father had conveyed to her brother what property he had in consideration of a life maintenance for himself. The father and brother with the rest of the family, except the pauper, went to Dead River in July, 1843. She, being too feeble to go then, was removed the next winter on a bed in a sleigh. They lived in that Plantation until the fall of 1865, when the brother bought a farm in Fayette, and moved there with his family in November. Respecting the removal of his sister from Dead River to Fayette, he testifies in substance as follows : "She left a day or two before I did when we broke up at Dead River. We put a bed into a wagon and brought her out twelve miles to the house of one Hutchings, in Plantation No. 2, not to visit but to stop, because we did not consider her able to ride from there in a wagon. She thought it would be easier to stop there till sleighing, and did so. I went for her then and brought her to Fayette December 27, 1865. She had always been a member of my family. I suppose she intended to go to Fayette with me as soon as she was able ; I think likely she would have gone then if she

Fayette *v.* Livermore.

had been able." She had no property at that time but the wear-ing apparel and a bed which she had with her. After coming to Fayette she continued to make one of her brother's family, and was supported by him. About the 16th of December, 1870, he informed one of the overseers of Livermore, that he had kept her off the town almost forty years, and could not keep her longer without pay. Some conversation was had about the amount he would charge for keeping her, but no contract was made, and on the morning of the 24th of December, her brother made applica-tion to Jones, one of the overseers of Fayette, and claimed that he must have something for taking care of her, and the overseer told him to take care of her and he would see to it. But no price was agreed upon until some ten days later, when he made a con-tract with another of the overseers of Fayette to keep her for $3 per week, under which she has ever since been supported. But in the afternoon of December 24, Jones conferred with Watson, another overseer of the plaintiff town, and reported the case and that he had engaged her brother to support her, and Watson agreed to the arrangement, and they made the notice to Livermore that after-noon, and sent it a day or two afterward by the brother, who seems to have agreed, at the time of the first application to Jones, to transmit the notice to the defendants. The brother seems through-out to have been determined that the pauper should be supported by Livermore, as the place of her original settlement, and to have timed his application to the overseers with this in view, inform-ing the overseers of both towns when five years would have elapsed from the time she arrived in Fayette, and declaring that he did not feel justified in carrying her to another town and keeping her there till she gained a residence. Hereupon, the defendants, the verdict being against them, complain that it is against law and evidence, and that there was error in the refusal of the presiding judge to instruct in conformity with their requests—in substance, that the action cannot be maintained unless it is proved that prior to mak-ing the notice some supplies had been furnished by the plaintiffs to the pauper for which they had a right of action against defendants,

and that the pauper gained a settlement by five years' residence in Fayette, if she was a member of her brother's family in November, 1865, and with his consent intended to make her home with him in Fayette, and would have gone with him in that month if she had been able to bear the journey, and did subsequently go in pursuance of her original intention and make her home there—in other words, that her home and residence in Fayette commenced upon the arrival of her brother's family there, if she was, and expected to continue to be a member of his family with his consent, but was prevented from pursuing her journey thither with them by her feeble condition.

There would be not a little force in the latter proposition if there could be such a thing as having a constructive home in a place, by virtue of an intention to go and live there before any actual arrival and bodily presence. Doubtless the wife or one of the minor children of George W. White, thus detained on the way would have had a settlement in Fayette in November, 1870. But it would not be by reason of their intention unaccompanied by bodily presence, but because they would follow the settlement of the husband and father. But we cannot hold that a sister thus dependent upon fraternal charity would have the home of her brother by reason of her intention and his consent, prior to her actual arrival. If intention of the pauper to establish a home in a particular place is necessary, bodily presence is equally so to effect such establishment. A home once established may be maintained without the concurring bodily presence, if the intention continues unchanged through all temporary absences. But in the outset one cannot make a home in a place by merely intending to do so. Whensoever the intention is conceived the home does not exist until the intention is executed by an actual concurring bodily presence.

Nor is there anything in the case of *Hampden v. Levant,* 59 Maine, 557, that militates against this. That case simply holds that a home may be abandoned by one who is absent bodily, if he forms, while thus absent, an intention thereafterwards to make his home elsewhere. It does not follow that his home from that time is in

the place where he intends to go to reside. One settlement remains until another is gained. But the same rule does not obtain with respect to homes. A home may be abandoned, and a person may have for years only a succession of temporary homes, or none at all; and almost always a greater or less interval of time intervenes between the abandonment of one home and the establishment of another. In *Hampden v. Levant*, it is held that the bodily absence and intention to abandon showed that the pauper then ceased to have a home in Hampden; but not that the intention when he returned to make his home in Winterport, made Winterport his home from the time the intention was formed.

In the case at bar the pauper began to have a home in Fayette, on her arrival there, December 27, 1865, and the requested instruction was rightly refused.

It is urged that the notice was premature; but we think not. It was given when two of the overseers of Fayette had had information that the brother refused to support the sister longer without compensation from the town, and when the second overseer who received the information from his associate had assented to the temporary arrangement made by the one to whom the brother applied, for her maintenance by the brother. She was then chargeable to the town, and a majority of the overseers had assented to the furnishing of supplies. It was not necessary to the validity of the notice that a specific bargain should have been concluded with the brother as to the amount of compensation with which he would be content, nor that she should have actually received and consumed any supplies for which Fayette could at that moment have maintained an action against Livermore. Without this, enough had been done to constitute a furnishing of supplies by Fayette.

The object of the statute requiring notice from the town furnishing the supplies to the town where the pauper has his settlement, is to prevent the accumulation of a bill, and give the town, which is ultimately responsible, an opportunity to remove the pauper to the place of settlement, where the presumption is that he may be supported with greater convenience and less expense.

When the town where the pauper falls into distress has become chargeable and has directed the furnishing of supplies effectively, having made a contract therefor which is in process of fulfilment and is thereafterwards fulfilled—the need of relief being established—the sooner the notice is given to the party ultimately responsible, the more perfectly it fulfills its purpose. If peculiar circumstances, prompt notice and immediate vicinity, enable the town where the pauper has his settlement to remove him before a bill of any amount has actually been run up, such town has no cause of complaint. It is the fact that the person has fallen into distress and has become chargeable to the town where he is found, which is essential in the notice, and this occurs when the overseers of the poor have found him in need of relief and assumed his support. If, as is more commonly the fact in ordinary cases of distress, provisions, fuel or clothing have been furnished in good faith, it is not necessary to prove also that they have been consumed, in order to entitle the town which furnishes to recover for them. In a case like this where a person without means has been thrown upon the town by a party who, though under no legal obligation to support her, had previously furnished the support, the notice might well be given as soon as the town had assumed the burden and recognized the case as one of actual need, and arranged generally for a continuance of necessary supplies at the expense of the town. The recovery for any supplies furnished more than three months before the giving of notice, is prohibited, but it is allowed for all such sums as accrue after the giving of the notice up to the time of the commencement of the action, even though no actual payment had then been made.

The difficulty in the way of the plaintiffs in *Verona v. Penobscot*, 56 Maine, 11, was not that no supplies had been furnished by the plaintiff town when the notice was given, but that, as the law stood when the supplies were furnished and the notice was given, and for two months afterwards, the persons to whom they were furnished, could not be made chargeable as paupers by receiving aid from the town. The case supposed, *arguendo*, by the learned

Fayette *v.* Livermore.

judge who drew the opinion in *Verona v. Penobscot,* is not the case at bar. We are not to be understood as holding that a notice given by overseers only *quia timent,* and before any actual distress existed, would be valid or well-timed. Here the order for supplies had been given by one of the overseers and assented to by another, and the pauper was thus actually chargeable, albeit nothing which could be the subject of a suit against the town where she had her settlement, might have been furnished or consumed by her. It was a case of actual existing necessity, so deemed by the overseers, and provided for by the general order to White for suitable supplies, before the notice was given.

Any *dicta* in the charge of the presiding judge, implying that the giving of this notice to the overseers of Fayette by the brother, was all that was necessary, without any assumption by them of the support of the pauper were purely immaterial, and could not have harmed the defendants, because the uncontradicted testimony in the case showed the assent of two of the overseers, before the notice was made, to the direction given by Jones to the brother, respecting the furnishing of support. Upon the question of good faith, the defendants complain of both the verdict and the instructions; but we do not see that they are justly aggrieved by either. There is no evidence that the brother was under any legal obligation or contract to support the sister, nor was he bound to relieve the town from which they both removed, and where she had her settlement, at the expense of the town where he had his home. There seems to be no reason to doubt the utter and complete destitution and helplessness of the sister, the moment the brother declined to support her longer. The instructions required the jury to find good faith on the part of the overseers of the plaintiff town in furnishing the supplies. They allude to the familiar fact that bad faith in matters of this kind consists, for the most part, in furnishing supplies where there is no destitution; but they do not ignore the possibility that bad faith may be shown in other ways. If the defendants' counsel wished instructions more specific, he should have requested them.

Bad faith is not to be presumed. The presumption is the other way ; and we see no evidence in the case that rebuts the presumption.                              *Motion and exceptions overruled.*

CUTTING, DICKERSON, DANFORTH and PETERS, JJ., concurred.