### CLAIRE HARRALL

*v.*

### HAMILTON WALLIS et al., executors, et al.

A testator, domiciled in New York, made his will there in July, 1869. In
August, 1869, he went to Europe for the purpose of perfecting his medical
education. From 1872 to 1878, he resided in France, and was married there
to the complainant in February, 1877, and continued to live with her there
until he was brought to this country by his brother, in 1878. He abandoned
his profession, and represented himself, at the time of his marriage, as a resi-
dent in Paris. He married a French woman, the complainant, and rented a
house near that city, in which he and she lived for fifteen months, and he
contemplated buying it if he could do so. His habits of intoxication impaired
his mind, and after he was brought here in 1878, he was adjudged a lunatic
and confined in an asylum in Pennsylvania for about three years, where he
died in 1881.—*Held*, that his domicil, at the time of his marriage, was in
France, although he had never petitioned for the enjoyment of civil rights
there; that his domicil was never changed thereafter, and that consequently
his wife was entitled, under the law of France, to one-half of his personalty
notwithstanding his will of 1869.

Harrall *v.* Wallis.

Bill for relief.  On final hearing on pleadings and proofs.

*Mr. John Linn* and *Mr. F. R. Coudert,* of New York, for complainant.

*Mr. F. McGee,* for defendants.

THE CHANCELLOR.

· This suit is brought by Mrs. Claire Harrall, of the city of Paris, against the executors and next of kin and legatees of her late husband, Dr. Frederick F. Harrall, deceased, for the recovery of one-half of all his personal property.  Dr. Harrall, who then lived in New York, left this country in August, 1869, and went to Europe for the purpose of perfecting himself in his medical education.  He remained in Europe up to the latter part of May, 1878, when he was brought to this country by his brother, who went there after him.  On his arrival here, he was taken to the house of his brother-in-law, in Englewood, in this state.  On the 28th of June following, on the petition of his brother George, a commission in the nature of a writ *de lunatico inquirendo* was issued out of this court to inquire con-

NOTE.—There is no presumption of law that a marriage was celebrated at any particular place, nor that property, especially money and other personal property, was acquired in any particular locality, *Dye* v. *Dye, 11 Cal. 163.* See *Savage* v. *O'Neil, 44 N. Y. 298.*

It has been held in New York that to acquire a domicil under the empire in France, the party must obtain the authorization prescribed by article 13 of the Code Napoleon, as well as continue to reside there, *Dupuy* v. *Wurtz, 64 Barb. 156, 53 N. Y. 556; Tucker* v. *Field, 5 Redf. 139;* see, also, *Caulfield* v. *Sullivan, 85 N. Y. 153; Hood's Estate, 21 Pa. St. 106.*

In *Bremer* v. *Freeman, 10 Moore's P. C. 306,* reversing *S. C., 1 Deane & Sw. 192,* an·Englishwoman resided uninterruptedly in France for a period of fifteen years, without any business or occupation in that country, renting apartments upon lease, and making declarations never to return to England, providing, moreover, a vault in the cemetery of *Père la Chaise* in Paris, where she expressed her wish to be buried.  In 1842, she made a will in Paris, in the English form, but not in conformity with the French law, bequeathing personal property, the bulk of which was in English funds, to parties resident in England.  The decedent was not, at the time of making her will, nor at her death, naturalized in France, nor had she obtained any authorization as re-

-cerning his sanity, under which it was found that he was of un-
sound mind, without lucid intervals, and had been so for three
years. The inquisition was confirmed. In the same month of
June he was taken to a lunatic asylum in Philadelphia, where he
remained for over three years, up to the time of his death, which
took place there July 5th, 1881. He was then past thirty-nine
years of age. When he went to Europe he was a bachelor. Before
going, and in the month of July, 1869, he made his will, by
which he gave all his property to his brothers and sister. Since
his death the will has been admitted to probate in the preroga-
tive court of this state. From 1872, and perhaps from an earlier
period, to May, 1878, he resided in France, and on the 20th of
February, 1877, he was married there to the complainant, with
whom he lived as his wife up to the time when he returned to
this country, as before stated. They lived in Suresnes, a few
miles from Paris, in a house which he rented and furnished. He
took a lease of it for two years, and they lived in it for fourteen
or fifteen months, when he returned to this country. He con-
templated buying the property, if he could, at the expiration of
the lease. During his entire residence abroad he was supported
by his income from his property here, and he engaged in no pur-

quired by article 13 of the Code Napoleon.—*Held*, that by the *jus gentium* the
decedent was *de facto* domiciled in France, and that the authorization of the
French government was not necessary in order to give the right of testacy;
and that the will, not having been executed in accordance with the require-
ments of the law of the domicil, was invalid, and probate was refused.

The same principle was recognized in *Collier* v. *Rivaz, 2 Curteis 855, 857 ;
Bloxam* v. *Favre, L. R. (8 P. D.) 101;* and in a French case (*Lloyd* v. *Lloyd,*)
-cited in a note to *Whicker* v. *Hume, 13 Beav. 401;* but see another French case
(*Melizet's Case*), cited in *Dupuy* v. *Wurtz, 53 N. Y. 572.*

In *Anderson* v. *Lanenville, 9 Moore's P. C. 325,* a testator, who sold his house
and furniture and broke up his establishment in England, in 1836, and went to
France, where he bought and furnished a house in which he resided perma-
nently (cohabiting with a French woman) until his death in 1849, with the
exception only of occasional short visits to England for business purposes, was
held to have fixed his domicil in France, which was not affected by his having
-expressed an intention to return to England, in an event which never hap-
pened, nor by his having, on one occasion when in England, executed a will
-according to the English form and law, or from the circumstance that the bulk
-of his property was, at his death, in the English funds.

Harrall v. Wallis.

suit except the study of medicine for awhile.  The complainant followed him to this country, arriving here in September, 1878. She claims that under the law of France she would, if he had died there, have been entitled to one-half of his personal property there, notwithstanding his will, inasmuch as there was no nuptial contract between them, and that country was the place of matrimonial domicil, which was never changed, and that on principles of international comity, the right will be accorded to her here.  On the other hand, the defendants allege that Dr. Harrall was never domiciled in France, but was domiciled here, and that he was not, when the marriage was contracted, nor at any time afterwards, of sound mind, and therefore could neither make a valid contract of marriage nor change his domicil.  It is fully established in the cause, and, indeed, is admitted in the answer, that if he was capable of entering into the matrimonial contract, he was lawfully married to the complainant in the city of Paris, in 1877.  There was a civil contract and ceremony, constituting a lawful marriage, on the 20th of February, and a marriage ceremony in the church on the 1st of March.  There is no proof that he was not competent to enter into the contract. It appears, by the certificate of the civil marriage, that he cor-

In *Hamilton* v. *Dallas, L. R.* (*1 Ch. Div.*) *257*, the personal property of an intestate domiciled in France, was held distributable under the French law, although he had never obtained the authorization imposed by article 13 of the Code Napoleon.  [See, especially, the French cases cited in the opinion, *pp. 271, 272*].

A French subject, by establishing himself in business in England, marrying and continuing to reside there for more than thirty years, making only occasional business visits to France, was held to have acquired an English domicil, notwithstanding his refusal to take out letters of naturalization in England, *Brunel* v. *Brunel, L. R.* (*12 Eq.*) *298 ; Doucet* v. *Geoghegan, L. R.* (*9 Ch. Div.*) *441;* see *Drevon* v. *Drevon, 10 Jur.* (*N. S.*) *717; Haldane* v. *Eckford, L. R.* (*8 Eq.*) *631; Greene* v. *Beckwith, 38 Mo. 384; Hicks* v. *Skinner, 72 N. C. 1;* and even voting in another state is not conclusive, *Hayes* v. *Hayes, 74 Ill. 312; Smith* v. *Croom, 7 Fla. 81;* see *Shelton* v. *Tiffin, 6 How.* (*U. S.*) *163, 185; Livermore* v. *Farmington, 74 Me. 154; Kellogg* v. *Oshkosh, 14 Wis. 623; Malone* v. *Lindley, 1 Phila. 192; Guier* v. *O'Daniel, 1 Binn. 349, note;* or leaving an original domicil by constraint, *Weaver* v. *Norwood, 59 Miss. 665; Duchess of Orleans' Case, 5 Jur.* (*N. S.*) *143;* see *White* v. *Brown, 1 Wall. Jr. 217;* or absence abroad for the purpose of obtaining an education, *Von Hoffman* v. *Ward, 4*

---

---

rectly gave the date of his birth, June 26th, 1842 (he was there-
fore about thirty-five years old at the time of the marriage), and
the place of his nativity, Bridgeport, in this country, and truly
gave the names of his parents, Henry K. and Sarah Harrall,
and stated that they were both dead. At the same time he de-
clared that he resided in Paris. The testimony of Mr. Proxi-
mart, who was one of his witnesses at the civil marriage, and
was present at the wedding breakfast, is that he was of sound
mind. The defendants insist that there is evidence, from his
letters written in 1877, as well as from the testimony of living
witnesses, that he was insane before, at the time of and after the
marriage; but all the facts relied upon on this head are easily
accounted for by the fact that he was addicted to intemperance.
George F. Tucker, who was a clerk in his father's banking-house,
in Paris, from 1874 to October, 1877, testifies that he observed
a change in Dr. Harrall, and first perceived it in the fall of 1876
or winter following. He says the chief thing was that Dr. Har-
rall did not recollect money matters; that he used to draw
money and not remember it, and when he came into the office
his language was mingled English and French, and that when
he wanted to draw on America he would "mix it all up." His

---

*Redf. 244; Rice's Case, 7 Daly 22; Kelly v. Garrett, 67 Ala. 304; or even the
oath of the party as to his intention, Wilson v. Wilson, L. R. (2 P. & D.) 435.*

In *Snider v. Robertson, 9 Rich. (N. S.) 213,* testator, having a brother H.,
who was an alien, and the chief object of his bounty, devised certain real estate
to G. in trust, and "for the use and benefit of my brother H., if alive at my
death, the legal title to remain and be vested in the said G. until such time as
the said H., now an alien, shall become duly qualified, according to acts of
congress of the United States of America, to take and to hold said real estate.
When the said H. becomes so qualified, the said G. is hereby directed to exe-
cute to the said H. a valid conveyance, in fee, to said real estate, the rents and
the profits to go to the said .H., from the time of my decease." H. never
became naturalized, but after the death of the testator he became a denizen
under the laws of South Carolina.—*Held,* that he was thereby qualified to take
the lands devised.

A statute providing that all personal property situated in Mississippi should
be distributed according to the laws of that state, regardless of marital rights
acquired in other states, and notwithstanding the domicil of the decedent and
of the parties interested was in another state, was upheld and applied in
*Slaughter v. Garland, 40 Miss. 172; Speed v. Kelly, 59 Miss. 47.* See *Orcutt's
Appeal, 97 Pa. St. 179.*

father, who was the head of the banking-house, testifies on the same subject, but attributes the change to intemperance. He says Dr. Harrall was very intemperate, and came to his office very often apparently under the influence of liquor. He says there were times when he came in that he was not fit to take his money, and he, the witness, spoke about it, and Mrs. Harrall was outside and would not let her husband take his money. As to the son, George F. Tucker, it appears from his own testimony that he did not regard Dr. Harrall as in anywise of unsound mind, for he says he used to visit Dr. Harrall at his house twice a week up to July or August, 1877, and that he has taken dinner there perhaps three times a week. He says he was often there over Sunday, and spent the whole day with him, and that he always had a very pleasant time; that Dr. Harrall always entertained him very nicely, and always wanted to have plenty of drink. He adds that Dr. Harrall was always very generous with the bottle, and was of a genial, pleasant, sociable temperament. He also says that at the last it grew tiresome, because Dr. Harrall was not talkative. Dr. Peet, who was Dr. Harrall's cousin, and who saw him in Paris in 1873, says he noticed a change in him then, that it was "a kind of

The right of a husband to receive, and of a bank to pay to him dividends declared upon shares of its stock owned by and standing in the name of his wife, was held to be determinable by the law of the country in which the bank was located, and not by that of the country in which the husband and wife were domiciled, *Graham* v. *First Nat. Bank, 20 Hun 326, 84 N. Y. 393;* see *Hill* v. *Wright, 129 Mass. 296; Holthaus* v. *Farris, 24 Kan. 784; Howell* v. *Cassopolis, 35 Mich. 471.*

An alien woman, by marrying a citizen of this country abroad, is entitled to inherit from him, although she never resided here, *Burton* v. *Burton, 1 Keyes 359; Kane* v. *McCarthy, 63 N. C. 299; Headman* v. *Rose, 63 Ga. 458; Labatut* v. *Schmidt, Spears's Eq. 421;* see *Ford* v. *Husman, 7 Rich. 165; Burnett* v. *Noble, 8 Rich. Eq. 58; Luhrs* v. *Eimer, 80 N. Y. 171; Potter* v. *Titcomb, 22 Me. 300; Roth* v. *Roth, 104 Ill. 35; Polk* v. *Ralston, 2 Humph. 537; Mc-Daniel* v. *Richards, 1 McCord 187; Douglas* v. *Douglas, 25 L. T. (N. S.) 530; Bate* v. *Incisa, 59 Miss. 513;* and may retain all rights of property secured to her under a marriage settlement made there, even if part of the property be acquired here after the marriage, *Besse* v. *Pellochaux, 73 Ill. 285; De Couche* v. *Savetier, 3 Johns. Ch. 190; Young* v. *Templeton, 4 La. Ann. 254;* see *Dun-*

daze over his intellect;" and yet he says that Dr. Harrall still
took the same interest as formerly in affairs at home, talked
about politics, about his privilege of voting and his legal resi-
dence in this country. He further says that the dazed condition
of which he speaks was not continuous, that it would last
through the day and then Dr. Harrall would be out of it; and
he says he does not know that it grew any worse while he was
there. He left Paris in the latter part of January, 1873, and
never saw Dr. Harrall afterwards. It may be added that he
says he took what he calls a "state dinner" with Dr. Harrall on
the occasion of his approaching departure for home. As will
have been seen, he speaks of January, 1873. Other persons,
however, who saw Dr. Harrall after that, and as early as 1874
at least, and had abundant opportunity to perceive any change
in him, say they first saw the change at a considerably later day.
Young Mr. Tucker says he first saw it in the fall of 1876 or
winter following, and that before that Dr. Harrall seemed to be
a man that could take care of himself, and showed no signs of
carelessness in his money matters, and was bright and quick.
His father says the loss of memory commenced, he thinks, "ex-
actly a year before February, 1877." He adds that he should

can v. Cannon, 18 Beav. 128 ; Jamieson v. Fisher, 2 E. & A. (Can.) 242 ; Astill
v. Hallée, 4 Quebec L. R. 120 ; Fuss v. Fuss, 24 Wis. 256 ; Ordronaux v. Rey,
2 Sandf. Ch. 33, 3 Id. 502.

The rights of a wife, under the laws of a foreign country, where the mar-
riage was contracted, continue and attach to the property of the husband
where he abandons her and dies domiciled here, Bonati v. Welsch, 24 N. Y.
157 ; Kendall v. Coons, 1 Bush 530 ; Parrott v. Nimmo, 28 Ark. 351 ; Craycroff
v. Morehead, 67 N. C. 422 ; see Bond v. Cummings, 70 Me. 125 ; Smith v.
McAtee, 27 Md. 420 ; Sands v. Marburg, 36 Ga. 534.

As to the validity of a will executed by a citizen of Michigan, in Iowa, while
on his way to another state, where he intended to settle, Gibson v. Van Syckle,
47 Mich. 439 ; see also Bonnell v. Dunn, 4 Dutch. 153, 5 Id. 438 ; Talmadge v.
Talmadge, 66 Ala. 199 ; Taney's Appeal, 97 Pa. St. 74 ; Shaw v. Shaw, 98
Mass. 158.

Administration where a decedent dies in itinere, Hilliard v. Cox, 1 Salk. 37 ;
Somerville v. Somerville, 5 Ves. 750 ; Griffith v. Griffith, Sayer 83 ; Allen v.
Orans, 2 B. & Ad. 423 ; Wells's Case, 15 Jur. 160 ; White v. Rose, 3 Q. B. 493 ;
Grant v. Great Western R. R., 7 U. C. C. P. 438 ; Fayette v. Livermore, 62 Me.
229 ; 1 Wms. on Exrs. [431].—Rep.

think it was 1875 or 1876, that it was increasing on him all the time, and that he did not notice any marked change. He says he would not have paid his draft unless he had seen him sign it. Some of Dr. Harrall's letters, written in 1877, are put in evidence. While they show a change in him, they, by no means, establish unsoundness of mind. Some of them were evidently written when he was greatly under the influence of strong drink. On the other hand, there is the testimony of persons who knew him at Suresnes while he lived there, and saw him daily, and some of them had frequent business transactions with him in a small way. He appears to have been competent to transact ordinary affairs. His letter of October 23d, 1877, eight months after his marriage, in which he refers to advice given to him by his brother Henry to sell the house at Bridgeport, and invest the proceeds in bonds of some kind, is evidence that at that time he was able to understand and transact business. It seems to me quite clear that his loss of mental vigor was attributable to his indulgence in intoxicating liquors, which, being continued, at last probably rendered him mentally incompetent to do business. I cannot conclude that when he was married he was mentally incapacitated to contract marriage, or change or establish his domicil. I have not overlooked the medical certificate put in evidence by the defendants. It was made by two French physicians in Paris in May, 1878, about fifteen months after the marriage. It is not competent evidence, and if it were, it certifies to Dr. Harrall's condition not at the time of the marriage, but more than a year afterwards. And it may be added, while it certifies that he was then in a feeble mental condition, it states that he understood what was said to him, and made appropriate replies, though he answered briefly and slowly.

That Dr. Harrall had settled himself in France to live there and make it his home, is evidenced by the fact that when he was married he had already lived there for five years and called Paris his place of residence; by his marrying a French woman and establishing himself in a house in France, on which he took a lease for two years, and which he contemplated buying, if he could, as a place of permanent residence, and in which he

resided with his wife. It appears by his letter of March 26th, 1877, written about a month after his marriage took place, that he had at that date already rented the house; so that he must have rented it soon after his marriage. He went to Europe merely to complete his medical education, but he appears to have abandoned his profession and settled himself down to live in France. In one of his letters, dated May 18th, 1877, about three months after his marriage, he says he is married and happy and contented, and in a postscript says he hopes, by economy, to come home "in some time;" and he says in another letter of September 4th following, that he will "try and make enough by economy to come to America." In a postscript to a letter of April, 1878, he says he "does wish his wife [would] come with him to America." But there is no evidence in these expressions of an intention to return to stay. When they were written he was settled at Suresnes, and was living there in a house on which he had a lease for two years. Had he been disposed to return to this country, he could at any time have obtained the money of his own from his own agent to do so. We have not the whole of the correspondence of which these letters form part, and therefore do not know to what propositions, suggestions or requests the expressions under consideration are replies. They seem rather to refer to a visit to America than to be expressions of intention to return here to live. It is entirely clear, from George Harrall's testimony, that Dr. Harrall did not leave France with no intention of returning. It appears from that testimony that when the witness told Dr. Harrall that he wanted him to go home with him, the latter said that he wanted to go back to Suresnes; and the witness says that Mrs. Harrall did not know that her husband was coming to America, and he also says he, the witness, told her she should not come with him. Dr. Harrall, when he left France, took no clothes with him except what he wore. It seems quite evident that his brother, who took him away, went to Paris for the purpose, and it appears from the testimony of their sister, that after he got here Dr. Harrall expected to return to France. One of the French witnesses testifies that when Mrs. Harrall wept, in view

of Dr. Harrall's going to America, he told her not to cry ; that he would return in three months and would have plenty of money, and she would be very happy.   There is no proof of any intention to change his domicil on his return to this country, but the evidence is to the contrary.   It is quite manifest that if he had been left to himself he would not have left France at all. He was attached to his wife, and not only is there no proof that he meant to abandon her, but he undoubtedly meant to return to her.   All the circumstances of his leaving France are opposed to the idea that he intended to return to this country to stay permanently.

By the law of France, where there is no contract between them on the subject, the parties to a marriage are, by what is called *le régime de la communauté,* entitled in common (each to one-half), by a kind of partnership, to the personal property which belonged to either of them at the time of the marriage, or which they acquired afterwards by title of succession or by gift (unless otherwise provided by the donor) and the produce thereof, and all the real estate acquired by either during the continuance of the marriage relation, except such as is acquired by inheritance or gift. *Code Civil* § *1401.*   If the husband, as in the case in hand, made a will before marriage disposing of his estate to others, it will only, as to the common property, be operative as to his share. "As a general rule," says Mr. Parsons, " the rights of the parties as springing from the relation of marriage, where there is no special nuptial contract, must be determined by the place where they then supposed themselves and intended to be domiciled." *2 Pars. on Cont. 111.*   " It is universally allowed," says Mr. Westlake, " that when a marriage takes place without settlement, the mutual rights of the husband and wife in each other's movable property, whether owned at the time of the marriage or afterwards acquired, are to be regulated by the law of the matrimonial domicil, so long as that remains unchanged." *Westlake Priv. Int. Law 352.*   Judge Story states it as a proposition, which, though not universally established or recognized in America, has much of domestic authority for its support and none in opposition to it, that " where there is no express contract the

law of the matrimonial domicil will govern as to all the rights of the parties to their present property in that place, and as to all personal property everywhere, upon the principle that movables have no *situs*, or rather that they accompany the person everywhere, and that as to immovables the law *rei sitæ* will prevail." *Story's Confl. L. § 186.* That domicil, where there is no intention to remove to another state, is that of the husband at the time of the marriage. It is urged in this case, however, that Dr. Harrall could not have obtained a domicil in France at the time of his marriage, because, it is alleged, the French code declares that a foreigner, to obtain a domicil in that country, must apply to the government for permission to do so, and obtain express authority from it to establish such domicil, and that Dr. Harrall made no such application. The provision in question is *L'étranger qui aura été admis par le gouvernement à établir son domicile en France y jouira de tous les droits civils tant qu'il continuera d'y résider. Code art. I. ch. 1 § 13.* But the object of that provision is to establish the mode in which a foreigner can become entitled to enjoy the civil rights of a Frenchman, and it does not affect the consideration of the question now before me. Although Dr. Harrall had not been admitted to the civil rights of a Frenchman, or, in other words, had, not, to use our form of speech on the subject, become naturalized in France, that fact did not prevent him from obtaining a domicil, in fact, there. And the rights of the complainant are to be determined, not by the decision of the question whether her husband assumed allegiance to the government of France, but by the decision of the question whether, when the marriage took place, he was domiciled, in fact, in that country. See *Dicey on Domicil 362.* Several cases are cited in which the French courts have held that, in the absence of any express nuptial contract, the husband's mere domicil, in fact, determined the widow's rights in his personal estate. It is urged that there are decisions of those courts to the contrary also.

But it is a question not depending for its determination merely on the decision of the French courts. It is a question of international law, upon which the adjudications of those courts are indeed of very high importance, but it is to be decided in this

Harrall *v.* Wallis.

case here according to what may seem to be just views and principles. I conclude from the evidence that Dr. Harrall, at the time of his marriage, was in fact domiciled in France; that he intended to reside there permanently, and did not intend to return to America to reside, and that after that time he never changed his domicil. It follows that as the law of France would give the complainant one-half of the personal estate of her husband notwithstanding the will, this court should therefore award it to her. Had Dr. Harrall been domiciled here, and died intestate, our law would have given to her one-half of his personal estate, for he had no children, and in this connection it will not be amiss to state, although the fact will not affect the decision, that in November, 1877, his attorney and agent in New York, who also was his friend and confidential adviser, wrote to him in regard to the condition of his business affairs here, giving him advice as to what he should do to protect his property against his generous disposition and the temptation to lavish expenditure, and stated to him that perhaps he was not aware that his marriage had annulled the will which he made before leaving this country, but that such was the fact. This was about nine months after the marriage. This statement of the law as to the revocation of his will by marriage was erroneous, as a statement of the law of New York where the testator was domiciled when he left this country. By that statement he undoubtedly was assured that the disposition of his property in case of his death could not be controlled or affected by that will. He died in Pennsylvania. By the law of that state a testator's marriage is, as to his wife, a revocation of his existing will, and her rights in his property on his death are the same, so far as that will is concerned, as if he had died intestate. But Dr. Harrall was not domiciled in that state. Nor was he domiciled here. His domicil, if not in France, was in New York. In my judgment, it was in the former. Though he did not die in this state, and was not domiciled here when he died, his personal property is here, and his will was proved here. This suit is therefore brought here. Had he remained in France up to his death, the complainant would have been entitled to one-half of his personal property.

She should, under the circumstances, be decreed to have the same right here. There will be a decree in her favor accordingly. She is entitled to costs, payable out of the estate.